OPINION
Following his arrest, Defendant-Appellant Carl Lee Ramey was indicted for one count of murder, one count of felonious assault, and one count of having a weapon under disability, the former two having firearm specifications attached. A jury found him guilty on all counts and both firearm specifications. Ramey now appeals this verdict, raising the following assignments of error:
 I. The trial court erred in denying Defendant-Appellant's Rule 29(A) motion.
 II. The evidence presented at trial was insufficient as a matter of law to support the conviction of Defendant-Appellant for aggravated murder.
 III. The trial court erred in the admission of state's exhibits 6-A, 10, 18, 19, 20, 21, 23, 24, 27-A, B, C, D, E, F, raised at trial.
Because Ramey's first two assignments of error raise the same argument, we will address them together.
 I, II
Ramey argues that the trial court should have granted his Crim.R. 29 motion for acquittal because the evidence was insufficient as a matter of law to support a conviction. Crim.R. 29(A) provides that "the court shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses." The term "sufficiency" represents a legal standard "applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." State v. Thompkins (1997), 78 Ohio St.3d 380, 386.
When reviewing a sufficiency of the evidence question, the appellate court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. Put simply, sufficiency is a test of adequacy. Dayton v. Davis (1999), 136 Ohio App.3d 26, 31, citing Thompkins, at 386.
At oral argument, appellant counsel argued that we must weigh all of the evidence when considering whether it was sufficient to convict Ramey. This is not the standard for sufficiency of the evidence, but instead resembles a manifest weight argument. When determining whether the verdict was against the manifest weight, the reviewing court must weigh all of the evidence to determine if the greater amount of credible evidence supports the verdict. Thompkins, at 387. A reversal on a manifest weight claim occurs because the court sits as a "thirteenth juror" and "disagrees with the factfinder's resolution of the conflicting testimony." Id. Conversely, to resolve a sufficiency question, a reviewing court must determine whether the evidence, if believed, would convince any rational trier of fact of Ramey's guilt beyond a reasonable doubt. State v. Eley (1978), 56 Ohio St.2d 169, 172.
In the present case, Ramey only raised a sufficiency of the evidence question. Therefore, our inquiry is limited to viewing the evidence in a light most favorable to the prosecution and deciding if it is sufficient to support Ramey's conviction.
Ramey alleges the evidence was insufficient (1) to identify him as the shooter, and (2) to prove that the bullet caused Andre Rogers' death. The state presented the following evidence:
 The bartender testified that, on the night of the incident, three black men came into the bar, one in a white muscle shirt, one in a black nylon jacket and one in a blue nylon jacket. They proceeded to the back of the bar and, within minutes, engaged in a fight with two other patrons. As the bartender attempted to break up the fight and escort them to the front of the bar, the man in the black nylon jacket ran out of the bar, and the man in the white muscle shirt hit the bartender with a bar stool. After hitting him, the man in the white muscle shirt also ran out of the bar. It is unclear at what point the third man left, but at that point, all three men had exited the bar.
 Immediately after being hit, the bartender ran to the door to lock these men out. As he tried to lock the door, the man in the black jacket pushed open the door and fired a shot into the bar. The bartender made another attempt to lock the door and the man fired two more shots. Two of the shots fired hit Randy Ealy and Andre Rogers. The bartender testified that the man firing the shots was definitely not the man in the white muscle shirt who hit him with the bar stool. As soon as the shots were fired, the bartender ran out onto the sidewalk in time to see the shooter enter a car with the other two men. All three individuals sped away in the vehicle. As a result of the shooting, Randy Ealy received a gunshot wound to his neck, and Andre Rogers sustained a gunshot wound to his buttocks. Andre died at home seven days after the shooting.
Another witness, Dwayne Casey, testified that he was standing outside the bar when he heard the commotion caused by the fight inside. He looked through the window and saw the fight as it moved toward the front of the bar. Soon after, a man that he recognized from high school, Carl Ramey, exited the bar. Ramey said to a woman standing outside the bar, "Don't worry `bout it, I'm — I'm gonna [sic] take care of it." He then walked quickly to a car, reached into the glove compartment, and walked quickly back to the bar. When Ramey neared the door, he pulled a gun from his waistband and fired three shots into the bar. After the third shot was fired, Ramey ran in the same direction he had earlier, while Casey ran in the opposite direction. Ramey and Casey never made eye contact.
Casey did not talk to the police the night of the shootings because he was scared. He did come into the bar three days later and disclosed to the bartender what he saw that night. Casey then spoke to the police, and readily identified Carl Ramey in a photo spread.
A third witness, Kathy Colhoun, viewed the shootings from outside the bar while sitting in her car. She could not identify the shooter or the other individuals involved, but she and her boyfriend wrote down the tag number of the vehicle the shooter escaped in, and gave that to the police. An officer at the scene radioed the vehicle information, including the tag number, to dispatch, and the information was broadcast to all officers in the area. Officer Ponichtera heard this broadcast and shortly thereafter saw the vehicle traveling in the opposite direction down the street. Immediately, Officer Ponichtera turned around and followed the vehicle.
After losing sight of it for a few moments, he located the vehicle in an alley behind a residence. In the meantime, people inside the residence had phoned the police and advised that an individual had come into their home stating that he was running from police. While Officer Ponichtera was speaking to an individual from inside the residence, Leon Ramey, Ramey's cousin, walked by as if he did not even see the officers. Someone pointed him out as the person who had entered the residence and stated he was running from the police. The officers then detained Leon. Later, the police recovered a torn white muscle shirt with blood stains inside the house.
When Leon was interviewed, he named Carl Ramey as the shooter. Leon also admitted he had been wearing the white muscle shirt at the bar. All of the witnesses who were inside the bar told police that the man in the white muscle shirt was not the shooter. However, Officer Ponichtera's report stated that the white muscle shirt matched the shooter's description. When asked about this on the stand, he explained that one of the individuals involved in the shooting incident had been described as wearing a torn white muscle shirt. It is important to note that Officer Ponichtera was not involved in the portion of the investigation which occurred at the scene of the shooting.
When police interviewed Carl Ramey, he originally gave a story of the evening that did not include him shooting into the bar. However, after police advised him that an eyewitness had seen him fire the gun, he confessed to shooting the gun into the bar "because I was afraid that Leon might get killed * * *." At the time of Ramey's interview, Andre Rogers had died, but the coroner had not yet determined the cause of his death.
Approximately a month after this interview, Ramey requested another interview with police. By this time, Andre Rogers' death had been ruled a homicide.
Ramey advised the detectives that he had confessed to shooting into the bar to protect his cousin, Leon. He claimed that Leon was the shooter, but he confessed hoping Leon would come forward on his own. Ramey then gave the name of an inmate that could verify his story, but when interviewed, that inmate did not verify Ramey's story.
Dr. Lehman from the coroner's office testified regarding the cause of Andre Rogers' death. Andre, who weighed about three hundred and fifty pounds, was shot in the buttocks. He was in the hospital for a few days and then released. The bullet was lodged in his femur, and the doctors did not remove it before releasing him from the hospital. When the bullet hit the femur bone, it caused pieces of the bone to splinter off into the muscles and veins. Specifically, there was damage to the femoral vein, either caused by the bone splinters or the bullet itself. The damage to the femoral vein caused a blood clot to form, which broke off and traveled to Andre's lung, resulting in a pulmonary artery thrombo-embolism, the ultimate cause of death.
The coroner testified that leaving the bullet in the bone was common practice and did not impact Andre's death. Further, although the coroner found vicodin in Andre's system slightly above therapeutic levels, this also did not impact his death. Dr. Lehman explained on cross examination that his job description did not include ascertaining medical malpractice. However, he testified unequivocally that the bullet caused the blood clot and the blood clot caused the death, so no intervening medical care was relevant.
After reviewing all of this evidence, which was presented here in a light most favorable to the state, we find that a rational trier of fact could have found Ramey guilty of the crimes. Accordingly, the trial court did not err in failing to grant Ramey's Crim.R. 29(A) motion for acquittal. The first and second assignments of error are overruled.
 III
In his third assignment, Ramey contends the trial court erred in admitting physical evidence and photographs of bullets and casings found at Binger's Bar and in Andre Rogers' body. It is well established that a trial court has broad discretion in the admission of evidence. State v. Goodwin (1999), 84 Ohio St.3d 331, 342. Evid.R. 403(A) requires a trial court to exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury." Admission of the casings, bullet fragments and pictures at the scene were probative to show that shots were fired into Binger's Bar. Further, pictures of and the actual bullet found in Andre's body were probative to indicate that he was, in fact, shot. We do not find that the probative value is outweighed by any potential prejudice. Accordingly, the trial court did not abuse its discretion by admitting the exhibits. Ramey's third assignment of error is overruled. _________ BROGAN, J.
WOLFF, P.J., and GRADY, J., concur.